# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DAVID MOYA, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | |
| ZAPATA COUNTY OF TEXAS, RAYMUNDO DEL BOSQUE, Jr., and JOE PEÑA, | § | |
| | § | |
| Defendants | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.  Plaintiff David Moya ("Plaintiff") brings this Complaint and Demand for Jury Trial against Defendants Zapata County of Texas, Sheriff Raymundo Del Bosque, Jr., and Executive Chief Joe Peña ("Defendants"). This is a Whistleblower action and a suit for Retaliation under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

2.  Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Defendants violated Plaintiff's civil and constitutional rights.

1

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all parties reside or are headquartered in this District and all the conduct at issue occurred in this District.

## PARTIES

4. Plaintiff is a natural person who resides in Zapata, Texas.

5. Defendant Zapata County may be served through the County's registered agent, Nellie Treviño, at 200 E. 7th Avenue, Ste. 154, Zapata, Texas 78076.

6. Defendant Sheriff Raymundo Del Bosque of Zapata, Texas, may be served through the County's registered agent, Nellie Treviño, at 200 E. 7th Avenue, Ste. 154, Zapata, Texas 78076.

7. Defendant Executive Deputy Joseph Peña of Zapata, Texas, may be served through the County's registered agent, Nellie Treviño, at 200 E. 7th Avenue, Ste. 154, Zapata, Texas 78076.

8. At all times relevant to this Complaint, Defendants acted through agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers.

## FACTUAL ALLEGATIONS

9. Plaintiff David Moya was born and raised in Zapata, Texas. Growing up, Moya always wanted to be a cop—and more importantly, he always wanted to be a good cop.

10. Plaintiff's father is Chief of Police for the Zapata County School District.

11. Plaintiff was a veteran of the Zapata County Sheriff's Office with a successful record of employment as a law enforcement officer over a seven-year career.

12.     Plaintiff began his law enforcement career in March 2015 as deputy sheriff for the Zapata County sheriff's department.

13.     In December 2018, Plaintiff left to become a police officer in Alice, Texas, and then deputy sheriff in neighboring Webb County.

14.     He moved back home to Zapata County to accept a more senior position as sergeant of narcotics in August 2019, then was promoted to lieutenant investigator in January 2022 by the newly elected sheriff, Defendant Raymundo Del Bosque.

15.     Plaintiff's career trajectory has been consistent with successful performance of duties and continued professional development.

*The Carlos H. Gonzalez Debacle*

16.      Carlos H. Gonzalez is a fairly anonymous 21-year-old from Zapata County with only a misdemeanor charge on his record.  So, it was a surprise when on October 27, 2022, the following article appeared in the Zapata County News (photo):

> **Cruising Around to Find Illegals**
>
> Wednesday, October 19, 2022 at 8:47 p.m. Zapata County Sheriff's Deputies located at U.S. 83, North of High Rest area observed a blue Ford F-150 1991 model heading north bound after shortly heading south bound.
>
> The vehicle was observed heading north when it came to a stop with hazard lights on. The deputies then made a consensual contact encounter with the driver identified as Carlos H. Gonzalez, 20, a known human smuggler. He stated he was test driving his truck, shortly after stating that he was heading
>
> **Continued on Page 2**

3

> **Cruising Around to Find Illegals**
>
> to and from San Ygnacio and Zapata to cruse. Deputies overheard him telling Carlos Campos, another known smuggler that he ran out of gas with the $20 he had given him. He stated he should know where he is by already having his location.
>
> Border Patrol showed up taking some intel and being alerted with a short ledger spotted by the deputies in the vehicle. Later, *Border Patrol* caught five illegal aliens in the brush within the area, where the scout had placed the truck on the shoulder lane.

17. Mr. Gonzalez was not a "known human smuggler" and has not been arrested or charged for the events described in the article. The newspaper's story was plainly defamatory and appeared to come from the sheriff's department where Lieutenant Moya worked since sheriff's deputies were mentioned in the article.

18. On the morning of November 3, Gonzalez's mother called and complained to Lieutenant Moya about the story. She informed him that her son had no criminal record that justified any part of newspaper article, which Moya confirmed.

19. Lieutenant Moya also learned that the young man had not been ticketed, arrested, or charged for anything related to the story.

20. The mother asked Lieutenant Moya who at the sheriff's department could be the source of such a story. Moya said he didn't know but advised her to speak with his superiors first and, if they could not help, consider consulting an attorney to negotiate with the newspaper about the story.

21. Immediately thereafter, Lieutenant Moya texted a photo of the article to Sheriff Del Bosque and Executive Chief Peña and asked who planted the story.

22. Peña texted back: "I sent to newspaper."

23. Then, Peña texted: "It was a BIAR."

24. A "BIAR" is an acronym for Border Incident Assessment Report, which is a confidential law enforcement document that compiles profiling, suspicions, hunches, and be-on-the-lookout requests among officers. While there is a usefulness to such professional "guess-work," it's also why BIARs are never disclosed to the general public, or at least shouldn't be.[1]

25. In this same text exchange, Lieutenant Moya notified Defendants in writing that Mr. Gonzalez "was named when he was not arrested and had nothing to do with moving illegals." He notified them that he had spoken with Gonzalez's mother, and that she was angry.

26. Subsequent to texting the Defendants, Lieutenant Moya repeated his concerns at length in a conversation with his immediate supervisor, Deputy Chief Jimmy Mendoza.

27. The publisher of Zapata County News, where the story appeared, stated that Sheriff Del Bosque and Executive Chief Peña were her sources for this story.

28. Sheriff Del Bosque did not admonish or reprimand his executive chief or act surprised or concerned that a BIAR report was sent to the newspaper.

29. Four days after first reporting the violation of Mr. Gonzalez's rights, Lieutenant Moya was fired.

---

[1] A BIAR may also contain such confidential personal information as driver's license and license plate numbers, dates of birth, home addresses, and the like.

*Talking Politics at the Dollar Store*

30. On November 7, 2022, Sheriff Del Bosque convened a panel consisting of Deputy Chief Jimmy Mendoza, Commander Fernando Hernandez, Executive Chief Peña, and Chief Deputy Carlos Ramirez. On the sheriff's instruction, they summoned Lieutenant Moya into an office and terminated his employment.

31. During the termination meeting, Chief Deputy Ramirez told Lieutenant Moya he was being fired in part because of what he said at the Dollar Store.

32. This was an unexpected revelation to Lieutenant Moya, but in fact he had been at the local Dollar Store, off duty, buying Halloween candy on October 30th. Chief Deputy Ramirez indicated that his wife overheard Moya at the store discussing misconduct allegations against a high-ranking county official.

33. Subsequent to Lieutenant Moya's termination meeting, he received a copy of the Separation of Licensee (F-5) form that the department was required to file with state regulators at the Texas Commission on Law Enforcement.

34. The F-5 form stated Moya was "Honorably Discharged" and was separated from employment "while in good standing and not because of pending or final disciplinary actions or a documented performance problem."

35. The F-5 form was signed by Sheriff Raymundo Del Bosque, who *attested* to state regulators that it was "a true and accurate explanation of the circumstances under which [Lieutenant David Moya] resigned or was terminated."

36. Since his termination, however, Lieutenant Moya has learned that the Defendants ordered at least five Sheriff's department employees to submit written complaints about Moya and threatened repercussions and consequences against anyone who refused.

37. This entire experience has caused Lieutenant Moya severe emotional distress and sadness, loss of sleep, fear, anxiety, depression and despair.

## TRIAL BY JURY

38. Plaintiff is entitled to and hereby demands a trial by jury. U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## CAUSES OF ACTION

### COUNT I: § 1983 RETALIATION CLAIM

39. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

40. Lieutenant Moya brings a retaliation claim under 42 U.S.C. § 1983 against Defendants who, acting under color of law, fired him for exercising his First Amendment rights.

41. Defendants acted under color of state law. When Defendants planted their defamatory story in the Zapata County News they were acting in their official capacity since media relations were an important part of their job duties as the heads of Zapata County law enforcement. Their retaliatory act, firing Moya, was likewise an intentional act taken as a function of Defendants' official employment and position.

42. Defendants' actions violated Lieutenant Moya's rights under the First Amendment. According to the Fifth Circuit, a police officer cannot be fired when the following are true:

(1) his speech involved a matter of public concern; (2) his interest in commenting upon matters of public concern was greater than Defendants' interest in promoting the efficiency of the public services they perform; and (3) his speech motivated the Defendants' decision to fire him. *See Thompson* v. *City of Starkville*, 901 F.2d 456 (5th Cir. 1990) (finding a police officer had standing under Section 1983 to assert First Amendment-based retaliation claims when these elements were met).

43. Lieutenant Moya's speech twice involved matters of public concern: that is, (1) police planting false stories and accusations of human smuggling in the media and (2) high-level official misconduct in the county government. On the one hand, Moya was attempting to alert the leadership of Zapata County law enforcement about misconduct, impropriety, and abuse of authority within the department. On the other, he was publicly commenting on additional official misconduct within the county government. In either case, there was no element of personal interest involved in Moya's speech, he was simply bringing to light official misconduct so that it might be corrected and/or understood.

44. Lieutenant Moya's interest in commenting upon matters of public concern was greater than the Defendants' interest in promoting the efficiency of the public services they perform. Accusing an innocent person of human smuggling in a newspaper does the opposite of promoting law enforcement efficiency, it diverts police and public attention away from real human smugglers to focus on someone who isn't committing this crime. Stifling discussion of public corruption in county government is also an improper and inefficient use of police resources. Thus, there is no countervailing efficiency interest to consider in this case.

45.     Lieutenant Moya's speech motivated the Defendants' decision to fire him.  First, his complaint to the sheriff and his executive chief turned out to be about their own unlawful actions.  They fired him less than four days after he made his revelation and complaint.  Second, department leadership also admitted to firing him for engaging in protected political speech a week earlier at the Dollar Store.

46.     The sheriff *attested* to state regulators that Moya was not terminated due to performance problems. This attestation, at least technically, is consistent with firing Moya for whistleblowing and in retaliation for the exercise of First Amendment speech rights.

47.     Defendants' post-termination effort to fill Moya's personnel file with co-worker complaints is not credible.  It is just more evidence of official misconduct, consciousness of guilt, and Defendants' willingness to orchestrate smear campaigns.  It is an obvious coverup, and not a serious alternative explanation as to why he was fired.

## COUNT II:  WHISTLEBLOWER CLAIM

48.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

49.     Texas Government Code Ch. 554 is the state whistleblower statute. To qualify for protection under the Statute, the employee must, in "good faith," report a "violation of law" by the employer to "an appropriate law enforcement authority." Tex. Gov't Code § 554.002(a).

50.     On November 3, 2022, Lieutenant Moya reported to the sheriff and his executive chief that someone in the sheriff's department had gone to the newspaper with a defamatory story. Moya made the report in a timely manner after speaking to the victim's mother that

day, reading the newspaper article, and ascertaining its falsity. There was no ulterior motive or opportunity for personal gain in making the report; thus, Moya acted in good faith.

51. Planting false criminal accusations in a newspaper implicates a host of legal violations, including defamation, invasion of privacy, civil rights violations, official misconduct[2], and publication of confidential information. This is especially true when a member of the media is given access to confidential, internal law enforcement documents, like BIAR reports.

52. In Zapata County, there are no municipalities or city police chiefs; the ultimate law enforcement authority thus is the county sheriff. The sheriff was "an appropriate law enforcement authority" to receive a report of police misconduct. Because the source of the violation of law in this case appeared to be—and was—someone from the sheriff's department, reporting the matter to the sheriff makes even more sense because of the sheriff's ability to launch an internal investigation. *See* Tex. Gov't Code § 554.002(b) (providing that an appropriate law enforcement authority is "part of a state or local governmental entity . . . that the employee in good faith believes is authorized to: regulate under or enforce the law alleged to be violated in the report or; investigate or prosecute a violation of criminal law").

---

[2] Tex. Local Gov't Code Sec. 87.011 defines "official misconduct" to mean "intentional, unlawful behavior relating to official duties by an officer entrusted with the administration of justice or the execution of the law."

53. At the time he reported the illegal violation of Mr. Gonzalez's rights, Lieutenant Moya did not know that it was Sheriff Del Bosque and Executive Chief Peña that were the perpetrators of the violation.

54. The employee must also show that he or she was subjected to an "adverse personnel action." Tex. Gov't Code § 554.002(b). The date of the whistleblower report was November 3, 2022. Lieutenant Moya was fired on November 7, 2022, four days later, which was an adverse personnel action.

55. Within 90 days of the violation, the employee must "initiate action" using the entity's "grievance or appeal procedures." Tex. Gov't Code § 554.006 (a) and (c). In this case, the grievance procedure available to Lieutenant Moya was initiated and completed the same day as his termination.

56. Normally, when a Texas county law enforcement officer is terminated or demoted, their ability to "initiate action" is within the confines of statutory civil service commission panels. However, Texas counties like Zapata with populations under 190,000 are not required to create a civil service commission, and Zapata chose not to do so.

57. Instead, Zapata County created its own grievance procedure, which is published in the "County of Zapata Personnel Policy Handbook." Section E of this handbook is entitled "Policy on Grievances." It states that all employees must first discuss their grievance with their immediate supervisor. Then, for employees who work for an elected official—such as the sheriff—the following rule applies:

> "a. All Elected Officials have the final decision for grievance in their departments. Employees who work for Elected Officials should take all grievances to that official for

Resolution. **The decision of the Elected Official shall be final in all grievances within the Elected Officials office."**

(Emphasis added).

58. This process was followed by both Lieutenant Moya and the sheriff's department. On November 7, 2022, Sheriff Del Bosque convened a panel consisting of Deputy Chief Jimmy Mendoza (Moya's immediate supervisor), Commander Fernando Hernandez, Executive Chief Jose Peña, and Chief Deputy Carlos Ramirez. The panel terminated Lieutenant Moya, then discussed their decision to terminate him and, after giving Moya an opportunity to be heard, stuck by their decision.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant for:

- Actual damages;
- Statutory damages;
- Punitive damages;
- Costs and reasonable attorney's fees;
- Injunctive reinstatement of employment;
- Any pre-judgment and post-judgment interest as may be allowed under the law; and
- for such other and further relief as the Court may deem just and appropriate.

Dated this 21st day of December 2022.

Respectfully submitted,

By: s/Kevin D. Green
Kevin D. Green
*Attorney-in-Charge*
Texas Bar No.: 00792544
S.D. Tex. I.D. No.: 3737219
**LAW OFFICE OF KEVIN D. GREEN**
7960 Mesa Trails Cir

Austin, TX 78731
Telephone: (512) 695-3613
kevin@consumerjusticecenter.com

Thomas J. Lyons, Jr., Esq. Attorney
I.D. #249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Facsimile: (651) 704-0907
tommy@consumerjusticecenter.com
*(Pro Hac Vice to be filed)*

*ATTORNEYS FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

On December 21, 2022, I filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas. I hereby certify that I have served the document on all counsel or parties of record in a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

s/Kevin D. Green